LEE & LEE INTERNATIONAL, INC., Cheng Yuan "Simon" Liu and Chi–Wen "Lucia" Liu, Plaintiffs,

v.

Annie LEE, Defendant.

No. CIV.A.3:97–CV–2976–L.

United States District Court, N.D. Texas, Dallas Division.

April 30, 2003.

666

Patrick J Schurr, Collins Norman & Basinger, Dallas, TX, for Plaintiffs.

Jerry L Hiersche, Russell W Mills, Hiersche Hayward Drakeley & Urbach, Addison, TX, for Defendant.

### MEMORANDUM OPINION
### AND ORDER

LINDSAY, District Judge.

Plaintiff Lee & Lee International, Inc. ("L & L Int'l") filed this action on December 8, 1997, pursuant to the court's diversity jurisdiction, asserting claims against Defendant Annie Lee ("Defendant") under Texas state law for breach of contract. On April 30, 1998, L & L Int'l amended its complaint to include as additional parties Plaintiffs Cheng Yuan "Simon" Liu ("Simon Liu") and Chi–Wen "Lucia" Liu ("Lu-

cia Liu") (the "Lius"), and to allege common law tort claims against Defendant Lee for fraud and tortious interference with a contract and existing or prospective business relations. The court conducted a one-week bench trial from November 30, 1999 to December 8, 1999, on each of Plaintiffs' claims against Defendant Lee. The parties filed their amended Proposed Amended Findings of Fact and Conclusions of Law on August 24, 2001. On June 7, 2002, the court heard argument on the parties' respective proposed findings of fact and conclusions. Having considered the evidence and arguments of counsel, the court now rules in favor of Defendant on all claims asserted by Plaintiffs. The court determines that Plaintiffs have failed to prove those claims by a preponderance of the evidence, and are therefore not entitled to any relief. In addition, Defendant Lee filed an alternative counterclaim for attorneys' fees, which the court hereby denies. Based on a preponderance of the evidence, the court makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## II. Findings of Fact [1]

This is a tort and breach of contract case involving the sale of a business known as Lee & Lee Fine Linens, Inc. ("Fine Lin-

ens") to the Lius in September of 1996. Plaintiff L & L Int'l is a Texas corporation incorporated under the laws of the State of Texas and having its principal place of business in the State of Texas. Plaintiffs Simon Liu and Lucia Liu are residents of the State of Texas.[2] Defendant Annie Lee is an individual residing in the State of California. The amount in controversy exceeds the sum of seventy-five thousand dollars, exclusive of interest and costs. The court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332(a).

Prior to September 20, 1996, Defendant and her former spouse, Jimmy Lee ("Mr. Lee"), owned and operated Fine Linens. Fine Linens was a Texas corporation involved in the manufacture, importation, and wholesale and exclusive design of miniature dolls, ornaments and decorative accessories. Fine Linens touted itself as being a recognized leader in the doll industry, specializing in handcrafted linen miniature dolls and ornaments using the medium "soft sculpture." Soft sculpture items are typically handcrafted objects made primarily of fabric and stuffed with some type of filler material to achieve various forms and shapes. Facial features and body parts are decorated using a wide variety of materials, such as paint, beads, lace, buttons, felt, knitted accessories, fur, cotton,

1. The facts contained herein are either stipulated or undisputed, or the court has made the findings based on the credibility and believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified which include: the relationship of the witness to Plaintiffs or Defendant; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the wit-

ness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. When necessary, the court comments on the credibility of a witness or the weight to be given a witness's testimony. Any finding of fact deemed a conclusion of law is adopted as a conclusion of law, and any conclusion of law herein made which also constitutes a finding of fact is hereby adopted as a finding of fact.

2. The court refers to L & L Int'l, Simon Liu and Lucia Liu collectively as "Plaintiffs," unless stated otherwise.

and botanical items like dried flowers, seeds or berries. According to Fine Linens, its dolls were unique because of their "country look" design, small sizes, and fine minute detail. Fine Linens mainly sold bunnies and bears and seasonal dolls such as snowmen, angels, and Santa Claus.

Defendant and Mr. Lee were the sole shareholders and officers of Fine Linens. Jimmy Lee served as president and was involved in the finances and day-to-day operation of the company, while Defendant Lee was involved in the area of sales, purchasing, and design. She also worked with the company's overseas factory agents.

Some time in December 1995, Defendant and Mr. Lee decided to sell their business, and placed an advertisement to purchase the business in a Chinese newspaper circulated in the Dallas area. In the summer of 1996, the Lius responded to the advertisement. Simon Liu had been a personal acquaintance of Jimmy Lee for approximately fifteen years. At the initial meeting, Mr. Liu was given a handout that had been prepared by Mr. Lee for potential buyers. The handout did not specifically identify the name of the business for sale; however, it did provide some background information about the company. The handout stated:

XYZ CORPORATION: THE PROFILE

* A well established 15 year old Texas, USA corporation.

* Clear history.

* Profitable in all 15 years of her history.

* Highest credit rating by DUN & BRADSTREET in her class of business.

* Manufacturer, importer & wholesaler of exclusively designed miniature dolls, ornaments and decorative accessories.

* Recognized leader in the U.S. in the doll industry—specialized in handcrafted linen miniature dolls & ornaments.

* Leader in the Wholesale Market—our dolls are very special and unique due to their "COUNTRY LOOK" design and their small sizes.

* Famous for our unique high quality well-made miniature dolls with every fine minute detail. We have very little competition that can challenge us.

* Factory located in southern China, making exclusively our products.

* Factory has a specially trained steady work force of 500, and has room for expansion to 1000 to double the out-put capacity for future growth.

* Our product line has a firm stand in the MARKET PLACE with over 15,-000 accounts.

* Enjoy good will & good reputation in the market & in the industry.

CUSTOMER BASE

Has more than 15,000 accounts in the U.S., including customers in Canada, Mexico, Europe, Japan & New Zealand.

* Businesses that sell our product line: gift shops, florists, X'mas shops, antique shops, boutiques, drug store chains, department store chains, craft stores, theme parks, catalogue stores, mail order firms ... etc ....

* Well known names that sell our product line: Disneyland stores, Disney World stores, Epcot Center, Knotts Berry Farms, Dollywood Theme Park, Silver Dollar City, J.C. Penney, Burlington Coat Factory, Colonial Williamsburg, Six Flags Theme Parks, Hallmark shops, Bass Pro Shops, 7th Avenue Catalog, Victoria Paper catalog ... etc ....

WHY THE OWNERS ARE SELLING THE BUSINESS?

* Early retirement.
* Spend more time with family and want to travel the world.

Although Defendant Lee was aware of the handout, she did not read or review the document before it was distributed to the Lius. During the negotiation of the business, Mr. Lee met several times with Simon Liu. They were the two who primarily negotiated the sale of Fine Linens and discussed contractual terms; however, Mr. Lee conferred with Defendant from time to time regarding the provisions of the Contract. Defendant authorized Mr. Lee to negotiate the contract with the Lius on behalf of Fine Linens. Defendant only met with the Lius twice during the negotiations. During one of her meetings with them, Defendant told the Lius that she was going to retire from the business, and that she was tired of her busy schedule, the extensive travel and hard work. She also stated that she was in poor health and really needed a rest. The representation regarding Defendant's retirement from the business was important to the Lius, and was a factor in their decision to purchase Fine Linens.

After several meetings and discussions, the Lius and Fine Linens entered into a Contract For Sale Of Business (the "Contract") on September 20, 1996 whereby the Lius agreed to purchase certain tangible and intangible assets of Fine Linens, including (1) the right to assume, operate and take over the company's existing business, (2) use of the trade name "Lee & Lee," (3) the goodwill of the business, (4) the method of operating the business, (5) vendor information, (6) the existing customer list, and (7) necessary training in all phases of the operation of the business. The purchase price for these assets was $300,000, which the Lius agreed to pay in cash and by way of two secured promissory notes. The Lius also agreed to purchase from Defendant and Mr. Lee the land on which the existing office/warehouse building was located at the fair market price and to pay, in addition to the building price, an amount of $30,000 for the "Inside Finish–Out" and the "Improvements" of the building. The Contract also included a two-year noncompete agreement.

Jimmy Lee, as President of Fine Linens, Simon Liu and Lucia Liu signed the Contract. Defendant did not sign the Contract; however, she authorized Jimmy Lee to execute it on behalf of Fine Linens. Defendant Lee neither instructed nor gave Mr. Lee authority to negotiate or execute the Contract act on her behalf, that is, in her personal capacity. The effective date of the Contract was January 1, 1997. Some time after execution of the Contract, Defendant and Mr. Lee dissolved Fine Linens, and the Lius incorporated L & L Int'l.

In April 1995, Wayland Ma ("Ma"), Defendant's current spouse, began operating a business in Vista, California under the name Annielee. Annielee is a sole proprietorship of which Ma is the sole shareholder. Defendant does not hold an ownership interest in, or receive compensation or any distribution from, this business entity. Like L & L Int'l, Annielee sells soft sculpture merchandise. The manner in which Annielee conducts business, however, is different from L & L Int'l in that none of its sales comes from inventory. Rather, Annielee arranges to have soft sculpture prototypes that have been designed by its customers (often commercial retailers) manufactured overseas and then once made directly shipped to them in the United States. L & L Int'l, on the other hand, has approximately 30% of its products manufactured overseas and directly

shipped to its customers in the United States. The remaining 70% of its merchandise is imported and stored in a warehouse as inventory and later sold.

Soon after the sale of Fine Linens, but before the effective date of the Contract (that is January 1, 1997), Defendant worked independently with Bath & Body Works, Inc. ("BBW") and Coynes & Company ("Coynes"), assisting them in the creation of designs for soft sculpture products. The designs were developed from sketches provided to Defendant by BBW and Coynes. Coynes and B & BW used the designs as prototypes to solicit closed bids from vendors, including Annielee, that could have the product manufactured. At the time of the Contract between Fine Linens and the Lius, BBW was an existing customer of Fine Linens. In 1997, BBW used Annielee to handle the manufacturing of certain products, some of which Defendant helped design.

Plaintiffs now assert common law claims against Defendant Lee for breach of contract, tortious interference with a contract and existing and prospective business relations, and fraud. They allege that after the closing of the Contract, Defendant set up a business in California (namely, Annielee), selling identical products sold by Fine Linens in violation of the noncompete provision of the Contract. They further allege that Defendant has tortiously interfered with the Contract between the Lius and Fine Linens, as well as Plaintiffs' existing or prospective business relations with BBW and Coynes. Finally, Plaintiffs allege that they entered into the Contract based on Defendant's false representation that she was going to retire from the soft sculpture business. Plaintiffs seek to recover compensatory and exemplary damages, costs of court, prejudgment interest, and attorneys' fees.

Defendant denies Plaintiffs' allegations, contending that she is not personally liable under the Contract because she never signed it and that, even if she is determined to be a responsible person, Plaintiffs have failed to prove that she breached the Contract. Defendant Lee further disputes that she made any material misrepresentations to the Lius regarding her intent to retire from the business, and disputes that she has interfered with any of Plaintiffs' existing contracts or prospective business relationships. In addition, Defendant Lee asserts an alternative counterclaim against Plaintiffs Simon Liu and Lucia Liu for attorneys' fees in the event she is found to be a responsible person under the Contract but not in violation of it.

### III. Conclusions of Law

### A. Breach of Contract

Plaintiffs assert a cause of action against Defendant for breach of contract. In particular, they contend that the Contract prohibited Defendant from setting up a business that sold products identical to those sold by Fine Linens before January 2, 1997. They further contend that Defendant breached the Contract by selling identical Lee & Lee products under the guise of Annielee prior to the expiration of the noncompete provision. Defendant contends that she did not breach the Contract because she had no duties to the Lius. Moreover, she contends that she did not sign the Contract or assent to it in her personal capacity and, therefore, cannot be individually bound by it.

■ The essential elements in a suit for breach of contract are: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) plaintiff was damaged as a result of the breach. *Runge v. Raytheon E–Sys., Inc.*, 57 S.W.3d 562, 566 (Tex.App.—Waco 2001,

no pet.); *Southwell v. University of Incarnate Word,* 974 S.W.2d 351, 354–55 (Tex. App.—San Antonio 1998, pet. denied).

Defendant argues that she is not liable under the Contract because she did not sign it; however, for a contract to be valid, it is not necessary that the agreement be signed by both parties. *Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co.,* 849 S.W.2d 380, 392 (Tex. App.—Hous. [14th Dist.] 1993, writ denied) (citation omitted). If the contract is signed by one party, the other may accept by her acts, conduct or acquiescence in the terms of the contract. *Id.* Normally, in such situations, the parties intend to be bound by the contract, and the party who did not sign the contract has relied on it and received benefits thereunder. That condition is absent in this case.

Nothing in the record indicates that Defendant was either an intended party to, or intended signatory on, the Contract. Rather, the evidence demonstrates that the Contract at issue in this case was expressly between *Fine Linens* and *the Lius;* that it was signed by Jimmy Lee, in his capacity as President of Fine Linens, Simon Liu and Lucia Liu; that Defendant was not a party to the Contract, did not sign it, and did not authorize Jimmy Lee to negotiate or execute it on her behalf as an individual or in her personal capacity. Further, there is no evidence that Defendant intended to be personally bound by the terms of the Contract.[3] To the contrary, Defendant testified at trial that she believed that any obligations that she may have had under the Contract were as a shareholder of Fine Linens, and that she did not agree to be obligated as an individual. She further testified that it was her understanding of the noncompete provision that she could not, as a representative of Fine Linens, set up a business selling identical Lee & Lee products. Based on the evidence before it, the court determines that Defendant is not individually liable under the Contract.

In closing arguments, Plaintiffs' counsel made a reference that Defendant ratified the Contract; however, nothing in the Complaint or Joint Pretrial Order indicates that Plaintiffs intended to contend that Defendant ratified the contract in her individual capacity. Plaintiffs intimate that Defendant ratified the Contract based on her conduct, and the court acknowledges their oblique reference to ratification by the following language in the Joint Pretrial Order:

> Although Defendant is not named by name in the Contract, there is a reference to obligations under the Contract being binding on officers and shareholders, of which there were only two. Some of the obligations under the Contract were complied with by Defendant,

3. The court notes that at trial Plaintiffs attempted to impeach Defendant on this issue. Defendant testified that although she stated in her deposition that she understood that she was individually bound under the Contract, she made a mistake and such testimony was incorrect. She stated that at the time of her deposition she was nervous, that it was the first one she had given in her life, that Plaintiffs' counsel was pressing her, and that she misunderstood him. The record reflects that during Defendant's deposition, Defendant's counsel attempted to clarify whether Plaintiffs' counsel was inquiring whether Defendant intended to be individually bound by the Contract. Defendant's counsel further stated that it was Defendant's position that she was only bound in her representative capacity. In response, Plaintiffs' counsel stated that he understood, and that Defendant's counsel would have an opportunity to cross-examine the witness. Under the circumstances, the court believes that Defendant did make a mistake in her deposition testimony, that she adequately explained the reasons for the mistake, and that her testimony at trial is an accurate statement of her intent regarding, and understanding of, the Contract.

such as training and introduction to vendors. *Id.* at 2. The court does not believe that this adequately raises the issue of ratification. This statement is merely consistent with the terms of the Contract, which obligated the corporate entity (Fine Linens) to perform certain responsibilities as a result of the sale. Evidence that Defendant performed these tasks is therefore insufficient to raise the issue of ratification. Also unavailing is Plaintiffs' argument that Defendant personally benefited from the Contract in that she received monetary compensation for selling the business to the Lius. Contrary to Plaintiffs' assertion, Defendant testified that she did not receive any proceeds from the sale of the business. Jimmy Lee further testified that the proceeds from the sale of the business went to Fine Linens, and that if Defendant received any proceeds from the sale, it would have been as salary paid to an employee of the company. Plaintiffs presented no evidence contradicting this testimony, or otherwise showing that Defendant personally, rather than Fine Linens, received a portion of the proceeds from the sale of the business.

■ Even assuming *arguendo* that Plaintiffs have adequately raised the issue of ratification, there is insufficient evidence to support a finding of ratification by Defendant. Ratification occurs if a party recognizes the validity of a contract by acting or performing under the contract or by otherwise affirmatively acknowledging it. *Missouri Pacific R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex.App.—Austin, 2002) (citations omitted). Stated another way, if a party by its conduct recognizes a contract as valid, having knowledge of all relevant facts, it ratifies the contract. *Id.* (citations omitted). As stated before, Defendant was not a named party to the Contract. Further, the evidence establishes that Defendant only intended to be bound by the Contract to the extent it was breached by Fine Linens. Plaintiffs have failed to show that Defendant ratified the Contract in her personal capacity, rather than as a representative of Fine Linens. Therefore, the court determines any purported theory of ratification untenable.

■ Further, to the extent Plaintiffs contend that the noncompete provision may be reasonably interpreted as expressly prohibiting *Defendant* from setting up a business selling identical Lee & Lee products, the court rejects the argument. In this case, there is no dispute that the Contract is unambiguous; however, the parties disagree over the proper interpretation to be given to the contract. Such a disagreement, however, does not render the contract ambiguous. A contract is unambiguous if the court can give it a definite legal interpretation, *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983), and is not rendered ambiguous simply because the parties disagree over its interpretation. *See Praeger v. Wilson*, 721 S.W.2d 597, 600 (Tex.App.—Ft. Worth 1986, writ ref'd n.r.e.).

The noncompete provision is contained in paragraph 16 of the Contract, and provides:

16. *Noncompetition*

In consideration of mutual covenants not to compete set forth below, Buyer and Seller hereby agree that:

(a) Seller, including its principal officers and shareholders, agrees that he [sic] shall not directly or indirectly, set up a business selling identical Lee & Lee products in the United States for a period not to exceed two (2) years, beginning January 1, 1997 and ending December 31, 1998.

Pls.' Trial Ex. 240 (Contract for Sale of Business) at 5. The provision may be reasonably interpreted as an agreement between the Seller (that is, Fine Linens—the corporate entity and its principal officers and shareholders) and Buyer (that is, the Lius) that *the company* will not sell Lee & Lee products for a two-year period of time.[4] Nowhere in the noncompete clause does it say that Defendant agrees that she will not set up a business selling Lee & Lee products. The Contract in no way prohibits its shareholders from selling Lee & Lee products in their individual capacity. While Plaintiffs may have intended for Defendant to be prohibited from setting up a business selling identical Lee & Lee products, that was not the agreement set forth in the Contract. The court has pored over the Contract, and there is simply nothing in it to indicate that Defendant agreed that she would not set up a business selling Lee & Lee products.

Throughout this litigation, Plaintiffs have insisted that Defendant authorized Jimmy Lee to negotiate and execute the Contract on her behalf; that she agreed not to set up a business or to sell identical products for two years; and that she agreed to be bound by the Contract. These contentions are not supported by the evidence. Unquestionably, the water has been muddied in this case; however, the bottom line is that the evidence is insufficient to hold that Defendant was personally obligated or bound by the terms of the Contract. The court concludes that Plaintiffs are not entitled to relief on their

claim against Defendant for breach of contract.[5]

## B. Fraud

### 1. *Merits of the Claim*

Plaintiffs have asserted a claim against Defendant for common law fraud based on her alleged false statement that she was going to retire from the soft sculpture business. Defendant contends that her statement does not constitute actionable fraud because it was neither material nor false, and the Lius' reliance on it, if any, was unreasonable. She further contends that the Lius have failed to establish that their damages, if any, were the result of her alleged false statement.

■ The essential elements of fraud and intentional misrepresentation are: (1) a material representation was made, (2) the representation was false, (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) the speaker made the representation intending that the other party act upon it, (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

■ Plaintiffs have proved this claim by a preponderance of the evidence. During their negotiations, Defendant made a

---

**4.** Although the provision states that the "Seller ... agrees that *he* shall not set up a business" (emphasis added), the term Seller, as defined in the Contract, means Fine Linens. As such the court assumes that the parties intended to say "it," and the reference to "he" was merely a typographical error. Of course, one could argue that since Jimmy Lee signed the Contract, it was he, rather than Defendant, who expressly agreed not to set up

a business selling identical Lee & Lee products. In any event, the parties did not raise the issue; therefore, the court need not consider it.

**5.** As the court has determined that Plaintiffs are not entitled to relief on this claim, their request for attorney's fees under the Contract is denied as moot.

material representation to the Lius in that she told them that she was going to retire from the soft sculpture business. Defendant contends that her representation was not material. A representation is "material" if it is important to the party to whom it is made in making a decision regarding the particular transaction. *See Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 613 (Tex.App.—Waco 2000, pet. denied) (citation omitted). "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Id.* (citations omitted). Here, the evidence supports a finding that Defendant made material misrepresentations concerning her retirement from the soft sculpture business. Indeed, given the Lius inexperience in the soft sculpture industry and Defendant's vast experience and knowledge in the business, it would be fatuous for them *not to consider, and rely on,* a representation by Defendant that she was going to retire from the business to be material.

Defendant's representation was false when made. Defendant argues that her statement was not false because in the Chinese language the word "retire" means *to rest,* which, according to her, she did after Fine Linens sold its assets to the Lius. In support of this contention, she points to evidence in the record showing that in 1997, she traveled to China several times because of her health and to visit family and friends. She further testified that after the sale of the business, she stopped traveling around the country doing trade shows, shipping goods, working every holiday, and servicing 15,000 customers. She also testified that she now only designs about 10–20 products for BBW and Coynes. The court finds Defendant's argument unpersuasive.

The evidence establishes that Defendant did not retire from the soft sculpture business as represented; and that her rest, at most, could only be characterized as temporary. Defendant repeatedly told the Lius that she was going to retire, and at no time did she explain to them that by this term she only meant to take a temporary rest from the business. The court moreover has researched the word "retire" in an online Chinese dictionary, and found that it means to abdicate; discharge; dismiss, expel; go to bed; quit; recede; relinquish; remove; resign; retreat; suspend; vacate; and withdraw. *See* English–Chinese Online Dictionary, *available at* http://www.tigernt.com/cgi-bin/ecdict.cgi. In light of this definition and the evidence regarding Defendant's conversations with the Lius about her poor health and her desire to retire from the business, it was reasonable for the Lius to understand that by retire, Defendant meant that she was going to cease working in the soft sculpture industry.

■ The court also finds that a reasonable inference can be made that at the time Defendant told the Lius that she was going to retire, she knew that the statement was false. Proof that a defendant made a statement knowing of its falsity may be proved by direct or circumstantial evidence. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 526 (Tex.1998). The evidence demonstrates that after Fine Linens and the Lius executed the Contract, Defendant continued working in the soft sculpture industry, designing prototypes for BBW and Coynes and arranging to have the prototypes developed into the same or similar type of soft sculpture that had been sold by Fine Linens. She also corresponded with her customers under the name AnnieLee Ma, using stationery that had as its letterhead the name of her husband's

company—Annielee. The evidence further shows that although Defendant claims that her husband was running Annielee, she was the one arranging marketing, production schedules, and quality control for the business. Indeed, while Ma may have been the sole proprietor of Annielee, the evidence demonstrates that Defendant was the one actually running the show on a day-to-day basis. When considered in its totality, the court is convinced that despite her representation to the Lius, Defendant never intended to retire from or cease working in the soft sculpture industry, and that she knew that any such representation was false.

■ That Defendant intended for the Lius to act on her representation can also be reasonably inferred from the evidence. A party's intent is determined at the time the party made the representation; however, it may also be inferred from subsequent acts. *Plunkett*, 27 S.W.3d at 613. Simon Liu testified that in her meeting with the Lius, Defendant presented them with a handout purporting to profile Fine Linens. The handout stated that the company had been profitable during her fifteen-year history; that the business was a leader in the doll industry; and that it had very few competitors. It also stated the owners were selling the business for three reasons: (1) early retirement, (2) to spend more time with family and (3) want to travel the world. Defendant Lee reiterated during her discussions with the Lius that she was going to retire from the business. She stressed that she was in poor health, and that she was tired of her busy schedule, the extensive travel and the hard work. Based on the evidence, the court believes that Defendant intended for the Lius to buy the assets of Fine Linens based, in part, on her representation that she was going to retire.

The evidence further establishes that the Lius relied on Defendant's representation, and reliance on this representation was reasonable. Simon Liu testified that he would not have bought the assets of Fine Linens had he known that Defendant was going to continue working in the industry and that he was going to have to compete against her. The court is aware that Mr. Liu was convicted of a crime involving dishonesty. The court is also aware of that Defendant knows the consequences and what she has to lose if a judgment is entered against her. Given these circumstances, and observing the demeanor of the witnesses on the witness stand, the court determines that the Lius are more credible than Defendant on this issue. Moreover, it simply defies logic and common sense that the Lius would not have relied on Defendant's statement that she was going to retire from the business in light of her vast experience and expertise in the soft sculpture industry, and that she was a well-known designer. In other words, it only makes sense that the Lius bought the business because they would not be in competition with Defendant. Indeed, with Defendant's retirement from the business, it only follows that the Lius would have a chance to develop their new business and "get it off the ground" without worrying about competition from a well known veteran in the industry.

### 2. *Injury*

#### a. *Actual Damages*

■ The final element necessary to establish fraud is whether the Lius suffered an injury as a result of Defendant's misrepresentation. Plaintiffs allege that as a result of Defendant's misrepresentation that she was retiring from the business, they have suffered actual damages in the form of lost profits on sales to BBW and

Coynes in the amount of $705,883.49.[6] Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa Plastics Corp.*, 960 S.W.2d at 49; *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997). The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received. *Formosa Plastics Corp.*, 960 S.W.2d at 49. The court discusses the state of the evidence as necessary to both measures of damages.

■ As Plaintiffs expressly seek "lost profits" on sales to BBW and Coynes, the court first considers whether they may recover under the benefit-of-the bargain measure damages. Under this measure of damages, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty. *Formosa Plastics Corp.*, 960 S.W.2d at 50. "[W]hile a benefit-of-the bargain measure can include lost profits, it only compensates for the profits that would have been made if the bargain had been performed as promised." *Id.* Attempting to apply the benefit-of-the bargain measure of damages in this case, however, is akin to trying to fit a square peg into a round hole—it simply does not fit.

■ Plaintiffs seek to recover "lost profits," but there is no evidence that in purchasing the assets of Fine Linens they bargained for the right to receive a certain amount of annual sales from BBW and Coynes. In any event, Plaintiffs' alleged damages based on lost profits are purely speculative, as there is no evidence that L & L Int'l or the Lius would have been selected by BBW and Coynes to manufacture their products. Ms. Linda Shandle, an employee in BBW's design department, testified in her deposition that in 1996 she worked with Defendant as a designer.[7] She also testified that the reason BBW did business with Fine Linens was because it was attracted to Defendant's product line, as well as her design touches and design. She further testified that BBW works with the designer and not necessarily a company, and that it will usually follow the designer. She moreover testified that BBW will do business only with those companies that have "fantastic" designs, and that the experience of the designer is an important factor. Plaintiffs have presented no evidence establishing a likelihood that they would have been selected as a vendor to manufacture the products of these customers had Defendant retired or ceased working in the industry. Because there is no evidence that Plaintiffs would have obtained these accounts, they have failed to establish with any degree of reasonable certainty their lost profits on the bargain. Plaintiffs' damages for lost profits are speculative, and as such are not recoverable. Plaintiffs thus have not shown how they have been injured.

As previously noted, Texas law also recognizes out-of-pocket damages as an appropriate measure of damages for claims

6. The approach taken by Plaintiffs is that their amount of damages is $705,883.49 for all alleged claims. The court has already determined that Plaintiffs are not entitled to recover on their claim of breach of contract and, as discussed later, are not entitled to recover on their claim of tortious interference. In taking the approach they did for damages, Plaintiffs rely solely on lost profits; however, as discussed later, the court has determined that such damages are speculative and not recoverable.

7. Designers, as defined by Ms. Shandle, are artists who work with BBW to create a look for its collection or items within a collection.

of misrepresentation. *Formosa Plastics Corp.*, 960 S.W.2d at 49. The out-of-pocket measure allows the injured party "to recover the *actual injury* suffered measured by 'the difference between the value of that which he has *parted with*, and the value of that which he has received.'" *Id.* While Plaintiffs have offered testimony, which the court finds credible, that they would not have purchased the business had they known that they were going to have to compete with Defendant, there is no testimony or evidence in the record to show what actual loss Plaintiffs have suffered as a result of their purchase of the business. While the Lius testified that they paid $300,000 for the assets of Fine Linens, there is no evidence to show the value of what they received. In other words, nothing in the record reflects how the value of the business was diminished after the Lius received it because of Defendant's misrepresentations. Since critical evidence is lacking regarding damages, the court has no basis to determine that Plaintiffs were injured and therefore make an award of damages for Defendant's tortious conduct.

#### b. *Punitive Damages*

■ Plaintiffs seek punitive or exemplary damages against Defendant, contending that she acted wilfully and intentionally when she made the misrepresentation about retiring from the soft sculpture business. As Plaintiffs have failed to show injury, they are not entitled to damages. An award of actual damages is necessary to support an award of punitive damages. *See Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 667 (Tex. 1990). Having been unable to determine that Plaintiffs suffered any actual damages, the court cannot award punitive damages.

### C. Plaintiffs Claims for Tortious Interference

Plaintiffs allege claims for tortious interference based on two theories. First, they allege that Defendant interfered with the Lius' agreements with Fine Linens under the Contract. Second, they allege that Defendant has interfered with their business opportunities or their relationships with actual and prospective customers, namely BBW and Coynes.

Turning to their first theory, Plaintiffs allege that Defendant has interfered with the Lius' Contract with Fine Linens. In this regard, they aver that Defendant, along with Jimmy Lee, sold Plaintiffs their accounts, including but not limited to the names of customers, and the right to sell Lee & Lee products to those customers in exchange for which Defendant and Jimmy Lee received valuable consideration. They further allege that Defendant and Jimmy Lee promised not to engage in a business selling identical product as that sold by Fine Linens. They allege that Defendant is selling merchandise identical to merchandise sold by Plaintiffs, has acted in a fashion contrary to the best interest of Fine Linens, and that Defendant's actions could only have been motivated by her personal interest. They further allege that Defendant's conduct is clearly inapposite to the terms of the Contract and the agreement of the parties thereto.

■ Under Texas law, "a party to a contract has a cause of action for tortious interference against any third person (a stranger to the contract) who *wrongly induces another contracting party to breach the contract.*" *Holloway v. Skinner*, 898 S.W.2d 793, 794–795 (Tex.1995) (emphasis added). To prevail on their claim of tortious interference with a contract, Plaintiffs must prove (1) the existence of a contract subject to interference, (2) the

occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Holloway v. Skinner*, 898 S.W.2d 793, 795. In this case, Plaintiffs do not allege that Fine Linens breached the Contract or that Defendant in any way caused Fine Linens to breach it. Instead, their claim is based on acts Defendant committed outside of her relationship with Fine Linens. Because there is no evidence that Defendant induced Fine Linens to violate a contractual obligation, Plaintiffs' claim of tortious interference under this theory fails as a matter of law.

Plaintiffs' next theory of tortious inference is based on Defendant's alleged interference with existing or prospective business relationships. With respect to this claim, they contend that Defendant had full knowledge of the customer base of her former company, including but not limited to BBW and Coynes. They further contend that one month after the effective date of the Contract, Defendant contacted both BBW and Coynes to sell them the same line of products as L & L Int'l, thereby going into direct competition with Plaintiffs. They further contend that these contacts were in direct violation of the noncompete provision of the Contract, and were designed to interfere with any business relationship or future business relationship of Plaintiffs with these two customers.

■ To establish a claim of tortious interference with existing or prospective business relationships, Plaintiffs must prove (1) there was a relationship subject to interference, or a reasonable probability the parties would have entered into a business relationship; (2) the act of interference was willful and intentional, or the defendant acted maliciously by intentionally preventing that relationship from occur-

ring with the purpose of harming the plaintiff; (3) such intentional act was a proximate cause of plaintiff's damage; (4) the defendant's actions were not justified or privileged; and (5) the plaintiff suffered actual damage as a result of the interference. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied).

■ Plaintiffs have failed to establish the first element of this claim. There is no evidence that *L & L Int'l* had an existing or prospective business relationship with BBW or Coyne's, except to the extent that these entities were, or were supposed to have been, on the customer list transferred to them by Fine Linens. That these customers were on a customer list, however, does not establish that L & L Int'l had a business relationship with them. Mr. Liu testified that when customers order products, it is for that point in time, and that there is no guarantee that the customer will reorder Plaintiffs' products in the future. The evidence establishes that BBW changed the look of their soft sculpture merchandise every year to offer its customers something new, fresh and different, and that it relied on designers who specialized in certain areas. Moreover, the evidence establishes that one of the reasons that BBW worked with Defendant was because of her design capabilities. Ms. Shandle testified that in her experience, BBW had a few designers that it liked a lot, and Defendant was one of them. She further testified that there is much competition in obtaining business from BBW. Mr. Liu testified at trial that Fine Linens never did any business with B & BW; that he had not made a presentation for a sales product to BBW; and had no pending business with BBW. Plaintiffs have failed to prove that there was a relationship between them and BBW that was subject to interference, or a reasonable probability

that they would have entered into a business relationship with BBW. Plaintiffs have established at most only a possibility of a business relationship. Anything beyond a possibility is mere speculation.

Similarly, Plaintiffs have failed to prove that L & L Int'l had any type of business relationship with Coynes, or that it was attempting to establish or cultivate such a relationship with this company. Because there is no evidence that L & L Int'l personally cultivated any type of relationship with BBW or Coynes, the court concludes that Plaintiffs are not entitled to recover under this theory of tortious interference.

### E. Defendant's Counterclaim for Attorney's Fees

Defendant asserts an "alternative counterclaim" against Plaintiffs Simon Liu and Lucia Liu for attorneys' fees pursuant to the terms of the Contract, which provides:

> Should any litigation be commenced between the parties of this Contract concerning said business, this Contract or the rights and duties of either in relation thereto, the party, Buyer or Seller, prevailing in such litigation shall be entitled, in addition to other such relief as may be granted, to a reasonable sum as for attorney's fees in such litigation which shall be determined by the Court or in separate action brought for that purpose.

Defendant pleads this counterclaim only as an alternative ground in the event the court finds that she is obligated under the Contract but has not violated the Contract. *See* Def.'s Original Answer to Second Am. Compl. & Application for Temporary Restraining Order and Injunctive Relief With Affirmative Defenses and Alternative Counterclaim at 7 n. 1. As the court has determined that Defendant is not obligated under the Contract, her counterclaim for

attorneys' fees is moot, and accordingly **denied.**

### IV. Miscellaneous

Based on the court's findings herein, Defendant's Motion to Dissolve Agreed Preliminary Injunction, filed February 8, 2000, is **granted**, and the preliminary injunction in this case is hereby **dissolved.**

### V. Conclusion

For the reasons stated herein, the court concludes that Plaintiffs have failed to prove by a preponderance of the evidence that they are entitled to relief on their claims for breach of contract, common law fraud, or tortious interference. The court further concludes that Defendant is not entitled to attorney's fees based on the provisions of the Contract. This action is hereby **dismissed with prejudice.** The court will issue judgment by separate document pursuant to Fed.R.Civ.P. 58., and the judgment will reflect that Plaintiffs take nothing by their claims against Defendant; that all allowable and reasonable costs are taxed against Plaintiffs; and that the preliminary injunction be dissolved.